UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| KEITH CRUMLEY, by Next Friend Shirley Crumley, )<br>)<br>*Plaintiff* )<br>)<br>v. )<br>)<br>KERRY J. FORESTAL, et al., )<br>)<br>*Defendants* ) | Cause No. 1:19-cv-4110-RLM-DML |

OPINION AND ORDER

Plaintiff Keith Crumley, through his Next Friend Shirley Crumley, filed a lawsuit over events that happened to him when he was arrested and incarcerated in October 2017. He sued several defendants, many of whose motions for summary judgment have since then been granted, but one remaining defendant is Nurse Teresa Pierce. Pending before the court is her motion for summary judgment on Mr. Crumley's claim against her under 42 U.S.C. § 1983. For the following reasons, the court GRANTS Ms. Pierce's motion [Doc. No. 105].

I. Background

Many of the background facts underlying Mr. Crumley's lawsuit are detailed in the court's September 29, 2021 order, located at docket entry 105. The court will assume the reader's familiarity with those facts and will only address the facts that are relevant to Mr. Crumley's claim against Nurse Pierce.

Mr. Crumley arrived at the Marion County Jail from Eskenazi Hospital on October 14, 2017, at approximately 8:40 a.m. and was put in an individual cell because of his status as a group home resident. At about 1:00 a.m. the next day, October 15, Nurse Pierce was made aware of Mr. Crumley's presence in the jail and his status as a group home resident. Group home residents are prioritized in receiving their intake screening to expedite their processing into the jail, so Nurse Pierce stopped what she was doing to complete Mr. Crumley's intake screening. Nurse Pierce didn't previously know Mr. Crumley was in the jail; the only way she would know if an inmate needed to be prioritized for intake screening is if an officer or other staff member notified her. She was already working an hour and a half over her shift that was scheduled to end at 11:30 p.m., but she attended to Mr. Crumley anyways.

Nurse Pierce can't diagnose patients, create a treatment plan for patients, determine the course of a patient's treatment, or order medical treatment or medication. That's all beyond her scope as a registered nurse. What she can do is triage and assess patients, take vital signs, communicate a patient's condition to the medical provider (physician or nurse practitioner), and provide treatment pursuant to a provider's order.

Mr. Crumley told Nurse Pierce the name of his group home and the group home manager during his intake screening. Nurse Pierce is trained by her employer to call the group home manager when completing a group home resident's intake screening to obtain patient information, so that's what she did. When verifying medications, she is required to obtain patient identification,

prescriber identification, medication name and dosage, prescription directions and expiration dates, and the date on which the prescription was last filed and in what quantity.

The group home manager told Nurse Pierce that Mr. Crumley took Clozaril to manage his schizophrenia. Clozaril is a dangerous antipsychotic drug used to treat schizophrenics when other drugs have failed. Clozaril requires regular monitoring with lab bloodwork—many pharmacies that dispense Clozaril require an absolute neutrophil count (ANC) obtained from lab bloodwork within 30 days of dispensing the medication. Clozaril isn't commonly used at the jail, so it isn't kept in stock. The jail's primary pharmacy—Diamond Pharmacy—requires that a patient have bloodwork in the past seven days showing their ANC.

When a patient is prescribed Clozaril, Nurse Pierce's employer requires staff to expedite the medication initiation because it's a "no-miss" medication. No-miss medications are those that shouldn't be interrupted because of their clinical necessity and have short enough half-lives such that routine initiation within 24 hours of intake might not be quick enough for appropriate continuity of care. Mr. Crumley takes Clozaril twice a day—once in the morning and once in the evening. Nurse Pierce was aware of the side effects Mr. Crumley might experience if he missed his scheduled doses of Clozaril, including low blood pressure, tachycardia, seizures, psychosis, hallucinations, and other conditions.

The group home manager also faxed Nurse Pierce a list of Mr. Crumley's medications—which confirmed his Clozaril prescription—and orally told Nurse Pierce that his last ANC draw was on August 23, 2017. This was beyond the

seven-day window that Diamond required for an ANC draw, so Nurse Pierce submitted a referral in the jail's medical records system requesting for a blood draw Mr. Crumley as soon as possible. She also emailed the jail's psychiatrist, mental health coordinator, and two others: "Hi, Keith Crumley is a group home resident of rescare. He is on [Clozaril]. Spoke to [the group home manager], [group home manager's phone number]. He stated that the last blood level was drawn on august 23rd. Made an appointment in the clinic to have his blood drawn on Monday 10/16/17, thanks." She then gave Mr. Crumley's prescription sheet and bloodwork information to the nurse coming on the next shift.

Nurse Pierce had access to Mr. Crumley's medical records from his past 2013 incarceration at the jail showing that he was a patient of Dr. Kellams at Eskenazi and that Dr. Kellams had prescribed Mr. Crumley Clozaril, but she didn't review these records during Mr. Crumley's intake screening.[1] Nurse Pierce

---

[1] Mr. Crumley says Ms. Pierce was required to read these records per policy. He cites to Ms. Pierce's deposition to back that up, but her deposition doesn't say that exactly. She says she was required to read the "receiving screen" from 2013, but that's not where the information about Dr. Kellams was. The information about Dr. Kellams was kept in the mental health notes, which she says she wasn't required to review.

This is important because Mr. Crumley argues that Ms. Pierce could have reviewed these records, saw that Dr. Kellams was Crumley's doctor and that he prescribed him Clozaril, and contacted Dr. Kellams to get Clozaril through Walgreens instead of the jail's pharmacy, then Mr. Crumley wouldn't have had to get bloodwork because Walgreens only requires bloodwork within 30 days of prescribing Clozaril, instead of seven. Mr. Crumley then could've gotten his Clozaril sooner.

This doesn't change that his screening was done at around 1:00 a.m. on October 15 and he was released at around 9:00 p.m. on October 16. Even if Mr. Crumley had got what he wanted, he would have received no more than one or two doses of Clozaril before he was released, depending on how quickly Dr. Kellams could have got the prescription over to Walgreens, and the jail could have got the Clozaril from Walgreens and given it to Mr. Crumley. Nor does it change that the jail ultimately fulfilled Crumley's prescription through Walgreens, as explained on the next page.

says that she wasn't required to look through the entirety of Mr. Crumley's records, including the part that would have showed her that Dr. Kellams was Mr. Crumley's doctor; she was only required to read the summary portion. Nurse Pierce also didn't contact any medical office or pharmacy—including Eskenazi—even though Mr. Crumley had been at the Eskenazi Emergency Department the night before and was transferred to the jail from there. Nor did she ask the group home manager for Mr. Crumley's medical provider's information. Contrary to what the group home manager told Nurse Pierce, Mr. Crumley's actual most recent blood draw and ANC was obtained on September 19, 2017, at Eskenazi—26 days before Nurse Pierce completed his intake screening at the jail.

On the next day, Nurse Pierce's shift at the jail started late evening October 15/early morning October 16. At 1:21 a.m. on October 16, she spoke with Dr. Gachaw about Mr. Crumley's Clozaril prescription. Dr. Gachaw ordered Mr. Crumley an ANC blood draw for later in morning on October 16 and a prescription for Clozaril 25 mg through Walgreens Pharmacy—not Diamond—to start on October 17 and to taper up over the next few days. At 1:35 a.m., Nurse Pierce emailed several of the jail's medical staff members about Dr. Gachaw's order for Mr. Crumley: "Hi, Keith Crumley 710923 is a group home resident of rescare. He has been on Clozaril and per telephone order by Dr. Gachaw, he needs a CBC with ANC drawn on Monday 10/16/17, thanks." Medical staff collected blood from Mr. Crumley around 11:20 a.m. for lab bloodwork to obtain an ANC.

Later that evening on October 16, Mr. Crumley was released to his group home with a supply of Clozaril. He was in a wheelchair, catatonic, and unable to speak or comprehend anything that was said to him. Medical staff documented that he hadn't been administered Clozaril in the jail because his ANC had not yet been obtained from the lab bloodwork and Diamond required his ANC. Mr. Crumley's group home worker took him to Eskenazi where he was admitted until October 24. Mr. Crumley was diagnosed with serotonin syndrome due to abrupt Clozaril withdrawal.

Mr. Crumley sued Nurse Pierce (and a host of other defendants) under 42 U.S.C. § 1983 for violations of his Fourth and Fourteenth Amendment rights. Nurse Pierce now moves summary judgment. In his response to Nurse Pierce's motion, Mr. Crumley moves to strike the use of Nurse Pierce's expert witness testimony for purposes of dispositive motions.

## II.   STANDARD OF REVIEW

"Summary judgment . . . is proper only if the pleadings, discovery materials, disclosures, and affidavits demonstrate no genuine issue of material fact such that [the movant] is entitled to judgment as a matter of law." Protective Life Ins. Co. v. Hansen, 632 F.3d 388, 391-392 (7th Cir. 2011); Fed. R. Civ. P. 56(a). The court's function at the summary judgment stage isn't "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In making that determination, the court must construe the evidence, and

all inferences that can reasonably be drawn from the evidence, in the light most favorable to the non-moving party. Id. at 249, 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . ."). The movant bears the burden of showing that there is no genuine issue of material fact, but the non-moving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. at 256.

To defeat a summary judgment motion, "the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial" Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007). *See also* Fed. R. Civ. P. 56(e)(2). Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005).

### III.   DISCUSSION

The court will first address Mr. Crumley's motion to strike before turning to Nurse Pierce's summary judgment motion.

*A. Mr. Crumley's motion to strike*

Nurse Pierce cites the expert opinions of Nursing Expert Kathryn Wild and Psychiatrist Daniel Yohanna in support of her summary judgment motion. Ms. Wild opined that Nurse Pierce acted reasonably, appropriately, and within the standard of care for nursing in her treatment and communications regarding Mr. Crumley. Dr. Yohanna opined that Nurse Pierce's care was reasonable and appropriate, including her decision to call the group home and rely on the information that the group home manager provided.

Mr. Crumley says that Nurse Pierce shouldn't be able to use those opinions because neither expert was disclosed by the court-ordered deadline for expert disclosures to be used in connection with a party's motion for summary judgment. Specifically, he says that the expert disclosure deadline was extended in June 2020 to December 3, 2020, and section III (G) of the case management plan requires expert disclosures be served on opposing counsel no later than 90 days before the dispositive motion deadline. That would make September 4, 2020, the expert disclosure deadline for summary judgment motions, but Nurse Pierce didn't serve Ms. Wild and Dr. Yohanna's expert disclosures until September 28, 2020 and October 2, 2020 respectively.

Nurse Pierce points out that the court granted the parties' joint motion to stay the December 3 dispositive motions deadline on November 12, 2020. The new dispositive motions deadline in the November 2020 order was set for 28 days after the court ruled on the then-pending motion for partial judgment on the pleadings, which ultimately ended up being February 5, 2021. Nurse Pierce says

Ms. Wild and Dr. Yohanna's expert disclosures were served 130 and 126 days respectively before February 5, 2021, making them well within the deadline to serve them 90 days prior to the dispositive motion deadline.

But when Nurse Pierce served Ms. Wild and Dr. Yohanna's expert disclosures in late September/early October 2020, the disclosures were already late because the December 3 dispositive motions deadline hadn't yet been extended. It was only after Nurse Pierce served her disclosures—when the court tied the dispositive motion deadline to the court's ruling on the then-pending motion for partial summary judgment on the pleadings—that they post hoc became timely.

Nonetheless, this court has discretion in determining whether to exclude improper expert reports. Africano v. Atrium Med. Corp., 2019 WL 5085338, at *1 (N.D. Ill. Oct. 10, 2019) (citing Karum Holdings LLC v. Lowe's Companies, Inc., 895 F.3d 944, 950 (7th Cir. 2018)). Nurse Pierce correctly points out that Mr. Crumley deposed both of her experts before the dispositive motion deadline and hasn't identified any prejudice related to the timeline of the disclosures. Mr. Crumley also had the disclosures for more than 120 days before dispositive motions were due, which is substantially more time that the 90-day allowance that was built into the case management plan. Accordingly, the court won't strike the expert opinions of Nursing Expert Kathryn Wild and Psychiatrist Daniel Yohanna in determining Nurse Pierce's motion for summary judgment.

*B. Nurse Pierce's motion for summary judgment*

Mr. Crumley claims that Nurse Pierce violated his Fourth and Fourteenth Amendment rights because she failed to act reasonably in obtaining Clozaril for Mr. Crumley in time to prevent his withdrawal side effects. He says Nurse Pierce took virtually no initiative to obtain the necessary information needed to allow Mr. Crumley to continue his Clozaril prescription. She didn't take any steps to verify the prescription information she received from the group home manager. Rather than calling Eskenazi to get the necessary prescription information, where Mr. Crumley had been treated immediately before his arrival, she instead simply relied on the scant and incorrect information from the group home manager. Mr. Crumley says this was objectively unreasonable, especially considering Clozaril's "no-miss" status.

Claims based on the adequacy of custodial medical care are "governed by an 'objective unreasonableness inquiry.'" Pulera v. Sarzant, 966 F.3d 540, 550 (7th Cir. 2020), cert. denied, 141 S. Ct. 1509 (2021) (citing Miranda v. Cty. of Lake, 900 F.3d 335, 352 (7th Cir. 2018)). "[T]he controlling inquiry . . . proceeds in two steps. The first step, which focuses on the intentionality of the individual defendant's conduct, . . . 'asks whether the medical defendants acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case.'" McCann v. Ogle Cty., Illinois, 909 F.3d 881, 886 (7th Cir. 2018) (quoting Miranda v. Cty. of Lake, 900 F.3d at 351)). "A showing of negligence or even gross negligence will not suffice." Id. (citing Darnell v. Pineiro, 849 F.3d 17, 35–36 (2d Cir. 2017) (concluding that

"[a]ny § 1983 claim for a violation of due process requires proof of a mens rea greater than mere negligence"). The objective-reasonableness standard doesn't constitutionalize medical malpractice claims. Miranda v. Cty. of Lake, 900 F.3d at 352.

The second step "focus[es] on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and [gauges] objectively—without regard to any subjective belief held by the individual— whether the response was reasonable." McCann v. Ogle Cty., Illinois, 909 F.3d 881, 886 (7th Cir. 2018). Four factors inform a court's determination of whether a defendant's response to an inmate's medical needs was objectively reasonable: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4) police interests, including administrative, penological, or investigatory concerns." Ortiz v. City of Chicago, 656 F.3d 523, 530 (7th Cir. 2011). "[T]he Fourth Amendment's reasonableness analysis operates on a sliding scale, balancing the seriousness of the medical need with the third factor—the scope of the requested treatment." Williams v. Rodriguez, 509 F.3d 392, 403 (7th Cir. 2007).

The record doesn't contain any evidence that Nurse Pierce purposefully, knowingly, or recklessly failed to take steps to verify Mr. Crumley's prescription information. Mr. Crumley makes much of the fact that Nurse Pierce could've known that Mr. Crumley's most recent blood draw was actually September 19 if she had called Eskenazi—the hospital that Mr. Crumley was just discharged

11

from the day before. And if she had checked all of Mr. Crumley's medical records from Mr. Crumley's 2013 incarceration, she would have discovered that Dr. Kellams could have prescribed Clozaril from a pharmacy that accepted the 26-day-old blood draw. Together, Mr. Crumley would have received Clozaril approximately a day sooner.

But that criticism doesn't establish that Nurse Pierce purposefully, knowingly, or recklessly failed to take steps to verify Mr. Crumley's prescription information, thus ignoring the potential consequences of her actions. On the contrary, she did take steps to verify Mr. Crumley's prescription information—she contacted Mr. Crumley's group home manager, who in turn faxed Nurse Pierce a list of Mr. Crumley's prescriptions and told her the date of his last blood draw. She just didn't take the steps that would've given her the most accurate and up-to-date information. That criticism "sounds in negligence, which is insufficient to support a claim for inadequate medical care under the Fourteenth Amendment[,]" more than it fits the higher mens rea standard that's applicable to an objective unreasonableness inquiry. McCann v. Ogle Cty., Illinois, 909 F.3d at 887 (finding that defendant's failure to take plaintiff's vital signs hours before he died insufficient to sustain a constitutional claim).

Even if Mr. Crumley's claim could survive the first step of the objective-reasonableness inquiry, it would fail the second. In caring for Mr. Crumley, Nurse Pierce called his group home for medical information, and based on what she was told, she immediately submitted a referral in the jail's medical records system requesting for Mr. Crumley a blood draw as soon as possible. She also

12

emailed the jail's psychiatrist, mental health coordinator, and two others apprising them of Mr. Crumley's situation. On the next day at the start of her shift, she spoke with Dr. Gachaw about Mr. Crumley's Clozaril prescription and emailed several of the jail's medical staff members about Dr. Gachaw's Clozaril order for Mr. Crumley. Nurse Pierce also asserts Ms. Wild and Dr. Yohanna's expert opinions that it was reasonable and appropriate for Nurse Pierce to call the group home and to rely on the information provided by the group home. This evidence was uncontroverted by Mr. Crumley.

All of this together shows that there is no genuine issue of material fact as to whether the medical care Nurse Pierce provided to Mr. Crumley was objectively unreasonable under the Fourth and Fourteenth Amendments.

## IV.   CONCLUSION

For the foregoing reasons, the court GRANTS Nurse Pierce's motion for summary judgment [Doc. No. 105].

SO ORDERED.

ENTERED: <u>October 19, 2021</u>

/s/ Robert L. Miller, Jr.
Judge, United States District Court

Distribution:  All Electronically registered counsel of record